FILED

2020 Jul-09  PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

WESTERN DIVISION

| | | |
|---|---|---|
| RICKY DUNCAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 7:19-cv-00447-LSC |
| | ) | |
| BIBB COUNTY SHERIFF'S | ) | |
| DEPARTMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Memorandum of Opinion**

Plaintiff Ricky Duncan ("Duncan") brought this suit against Sheriff Jody Wade ("Sheriff Wade" or "Wade"), Deputy Jimmy Ward ("Deputy Ward" or "Ward"), Officer Jim Gray ("Officer Gray" or "Gray"), and City of Centreville ("Centreville") (collectively "Defendants") under 42 U.S.C. § 1983 for exemplary and punitive damages for injuries he suffered during a traffic stop and police pursuit.[1] Before the Court are Defendants' motions to dismiss Duncan's complaint on the grounds that it fails to state a claim and that they are entitled to qualified immunity. (Docs. 49, 51, and 55.) The issues have been fully briefed by the parties and are ripe for

---

[1] Duncan's amended complaint states his causes of action are fourth amendment – excessive use of force, failure to train – excessive force, failure to train – emergency medical care; and fourth and fourteenth amendments - federal false arrest. (Doc. 48 at 9 - 15.)

review. For the reasons stated below Wade, Gray, and Centreville's motions to dismiss (docs. 49 and 55) are due to be GRANTED and Ward's motion to dismiss (doc. 51) is due to be DENIED.

## I.    Background[2]

On the morning of March 4, 2018, Ricky Duncan was driving his step-mother's vehicle in Centreville, Alabama when Officer Gray of the City of Centreville Police Department pulled him over, claiming that his car's rear-view mirror was too low. After a brief trip to his cruiser, Officer Gray returned to Duncan's car and asked him to step out of the car because there was allegedly a warrant out for his arrest. According to Duncan, he knew no such warrant existed and he believed that Officer Gray lacked any power to arrest him and so he failed to follow Officer Gray's instructions to step out of the car. Instead, Duncan drove away from the stop.

Officer Gray followed Duncan and called for additional law enforcement to join him in pursuing Duncan's vehicle. Among the officers and deputies who joined the pursuit were Deputy Ward of the Bibb County Sheriff's Department and Officer Deason of the City of Brent Police Department.

---

[2] In ruling on a motion to dismiss, this Court must accept the plaintiff's factual allegations as true and construe them in his favor. *See Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1345 (11th Cir. 2011) (citing *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010)).

Duncan drove his vehicle toward his brother's residence, but stopped before reaching it. Officers and deputies immediately surrounded Duncan. When Duncan exited the car, he was holding a pistol in his left hand above his head. Duncan insists that he was surrendering. Duncan alleges that as he began to stand up out of the car with his back facing the officers, Deputy Ward and Officer Deason shot him multiple times. The bullets struck Duncan in the neck and left wrist, causing him to drop the gun from his hand and fall back into the car seat. When he attempted to stand up once more, Deputy Ward and Officer Deason again shot him several times.

Paramedics did not arrive on the scene until one hour after the shooting. In the interim, the officers and deputies attempted to dress Duncan's gunshot wounds. Finally, paramedics arrived and transported Duncan to DCH Hospital in Tuscaloosa, Alabama, where he received treatment for his injuries caused by the gunshot wounds.

## II.    Standard of Review

A pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the facts alleged in the complaint must be specific enough that the claim raised is "plausible." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim for relief that is *plausible on its face*.") (internal quotations omitted) (emphasis added). "To be plausible on its face, the claim must contain enough facts that 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Pouyeh v. Univ. of Ala. Dep't of Ophthalmology*, No. CV-12-BE-4198-S, 2014 WL 2740314, at *3 (N.D. Ala. June 16, 2014) (quoting *Iqbal*, 556 U.S. at 678) (alteration in original). Conclusory statements of law may "provide the framework of a complaint," but the plaintiff is required to support them with "factual allegations." *Iqbal*, 556 U.S. at 679.

The process for evaluating the sufficiency of a complaint has two steps. This Court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Conclusory statements and recitations of a claim's elements are thus disregarded for purposes of determining whether a plaintiff is entitled to survive a motion to dismiss. *See Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010) (citing *Iqbal*, 556 U.S. at 687). Next, this Court "assume[s] [the] veracity" of "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. A complaint's factual matter need not be detailed, but it "must . . . raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In reviewing the complaint, this Court "draw[s] on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Nonetheless, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable." *Twombly*, 550 U.S. at 556. This Court considers only "the face of the complaint and attachments thereto" in order to determine whether Plaintiff states a claim for relief. *Starship Enters. of Atlanta, Inc. v. Coweta Cnty., Ga.*, 708 F.3d 1243, 1252 n.13 (11th Cir. 2013). Generally, the complaint should include "enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory.'" *Am. Fed'n of Labor & Cong. of Indus. Orgs v. City of Miami, Fla.*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683-84 (11th Cir. 2001)).

## III.  Analysis

Duncan's Third Amended Complaint contains five counts: Count One – excessive use of force in violation of 42 U.S.C. § 1983 against Ward; Count Two – failure to train excessive force in violation of 42 U.S.C. § 1983 against Wade; Count Three – failure to train emergency medical care in violation of 42 U.S.C. § 1983 against Wade and the City of Centreville; Count Four – false arrest in violation of 42 U.S.C. § 1983 against Gray; and Count Five – assault and battery under Alabama

law against Deason. Before this Court are Defendants' motions to dismiss some of the parties as to Counts One through Four of Duncan's Third Amended Complaint.

## A. Ascertaining the Capacity in Which Defendants Are Sued

As an initial matter, the Court must determine the capacity in which Duncan sues each defendant. Plaintiff's Third Amended Complaint is "silent" as to whether Defendants are sued in their individual capacities, official capacities, or both. (Doc. 48.)

"Plaintiffs are not usually required to designate, with particular words in the pleadings, that they bring their action against defendants in the defendants' individual or official capacities, or both." *Hobbs v. Roberts*, 999 F.2d 1526, 1529-30 (11th Cir. 1993). However, "[i]n general," plaintiffs have a "duty to make plain who they are suing and to do so well before trial." *Colvin v. McDougall*, 62 F.3d 1316, 1318 (11th Cir. 1995). Thus, "[i]t is obviously preferable for the plaintiff to be specific in the first instance to avoid any ambiguity." *Hafer v. Melo*, 502 U.S. 21, 24 n.* (1991) (quoting *Melo v. Hafer*, 912 F.2d 628, 636 n.7 (3d Cir. 1990)). When a complaint does not identify "in which capacity the defendants are sued, the course of proceedings typically indicates the nature of the liability sought to be imposed." *Jackson v. Georgia Dept. of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994).

Here, in examining the course of the proceedings, the court concludes for two reasons that Plaintiff has sued Defendants Ward, Wade, and Gray in their individual capacities. First, Plaintiff seeks punitive damages from each of these defendants. (Doc. 48 at 16.) In § 1983 actions, punitive damages are only available from government officials when sued in their individual capacities. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268-70 (1981). Because Plaintiff may not obtain punitive damages from Defendants[3] in their official capacities, the logical inference is that Plaintiff seeks punitive damages from Defendants in their individual capacities. Second, Defendants have asserted the affirmative defense of qualified immunity in this action. The Court notes that the invocation of qualified immunity allows the presumption that the lawsuit is filed against Defendants in their individual capacities. *See Fitzgerald v. McDaniel*, 833 F.2d 1516, 1520 (11th Cir. 1987).

Additionally, the court concludes that the Plaintiff brings official capacity claims as well as individual capacity claims. Officer Gray specifically argues that the official capacity claims are redundant of the claims against the City of Centreville. Sheriff Wade and Deputy Ward raise the Eleventh Amendment as a defense to

---

[3] "Defendants" in Sections III.A. to III.C. refers only to Sheriff Wade, Deputy Ward, and Officer Gray. City of Centreville is not included.

the § 1983 claims because they are municipal officials sued in their official capacities. Therefore, the Court concludes that Plaintiff brings his § 1983 claim against Ward, Wade, and Gray in both their individual and official capacities.

### B. Official Capacity Lawsuits

#### 1. Sheriff Wade and Deputy Sheriff Ward

Sheriff Wade and Deputy Ward assert that Plaintiff's official capacity claims against them are due to be dismissed based on the Eleventh Amendment to the United States Constitution because state officials are not "persons" within the meaning of § 1983. However, Plaintiff argues whether Defendants were acting within their official capacities is a question of fact. For the reasons that follow, the court agrees with the Defendants.

First, the Eleventh Amendment unequivocally bars suits for money damages against a state by the citizens of that state, unless the state waives its sovereign immunity or Congress abrogates said immunity. *See Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524 (11th Cir. 1990). Congress has not abrogated Eleventh Amendment immunity in § 1983 cases, nor has the State of Alabama consented to suit. *Id.* at 1525. Moreover, Eleventh Amendment immunity extends to state officials sued in their official capacities when "'the state is the real, substantial party in interest.'" *Id.* at 1524 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465

U.S. 89, 101 (1984)). When an award of damages would be paid by the state, "the state is considered the real party in interest . . . ." *Id.*

Under Alabama law, because sheriffs are deemed "executive officers of the state," lawsuits against sheriffs in their official capacities are, in essence, lawsuits against the state. *Id.* at 1525 (citing *Parker v. Amerson*, 519 So.2d 442, 443 (Ala.1987)). Thus, the Eleventh Amendment provides absolute immunity to sheriffs sued in their official capacities. *Id.* This immunity also extends to deputy sheriffs because of their "traditional function under Alabama law as the Sheriff's alter ego." *Id.* at 1527. Therefore, based on the foregoing, the court finds that the Eleventh Amendment bars Plaintiff's § 1983 claims brought against Sheriff Wade and Deputy Sheriff Ward in their official capacities.

Second, the court finds that Defendants, to the extent that they are sued in their official capacities, cannot be held liable under the Eleventh Amendment because they are not "persons" within the meaning of § 1983. As noted in *Carr*,

> States and their officials no longer need to rely exclusively on Eleventh Amendment immunity to avoid liability in their official capacities in section 1983 cases. In *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), the Supreme Court held that states and state officials are not "persons" subject to liability under § 1983.

916 F.2d at 1525. Accordingly, the court finds that all claims against Sheriff Wade and Deputy Ward in their official capacities are due to be dismissed.

**2. Officer Gray**

"When an officer is sued under Section 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'" *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). "Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents." *Id.* (citing *Kentucky*, 473 U.S. at 165-66).

In reliance on this notion, courts in this Circuit routinely and overwhelmingly deem suits against both a local government official in his official capacity and the entity of which the officer is an agent to be redundant, and dismiss the official-capacity claims against the individual defendant on that basis. *See, e.g.*, *Abusaid v. Hillsborough Cty Bd. of Cty Comm'rs,* 405 F.3d 1298, 1302 n.3 (11th Cir. 2005) (explaining that where plaintiff named county and county fire marshal in his official capacity as separate defendants, only the fire marshal's employer—the county—was proper party); *Busby,* 931 F.2d at 776 ("To keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant and possibly confusing to the jury.").

Defendants correctly assert that suits against municipal officials in their official capacity are the functional equivalent of suits against a municipality itself.

*Busby*, 931 F.2d at 776. Because the official capacity claim against Officer Gray is the same as a claim against Centreville, the claim against Officer Gray in his official capacity is due to be dismissed.

### C. Individual Capacity Lawsuits and Qualified Immunity

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure "when its allegations, on their face, show that an affirmative defense bars recovery on the claim." *Cottone v. Jenne,* 326 F.3d 1352, 1357 (11th Cir. 2003). "Qualified immunity from suit is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Brown v. City of Huntsville, Ala.,* 608 F.3d 724, 733 (11th Cir. 2010) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). When a defendant asserts the affirmative defense of qualified immunity, "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). "Absent such allegations, 'it is . . . appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage.'" *Cotton v. Jenne*,

326 F.3d 1352, 1357 (11th Cir. 2003) (quoting *Gonzalez v. Reno*, 325 F.3d 1228,

1233 (11th Cir. 2003)).

"Section 1983 provides a remedy against 'any person' who, under color of

state law, deprives another of rights protected by the Constitution." *Collins v. City*

*of Harker Heights*, 503 U.S. 115, 120 (1992). The statute "does not in itself create

federal rights, but rather provides a vehicle for asserting those rights in situations

where a plaintiff 'was deprived of a federal right by a person acting under color of

state law.'" *Sprauer v. Town of Jupiter*, 331 Fed. Appx. 650, 652 (11th Cir. 2009)

(quoting *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001)).

The doctrine of qualified immunity provides that a government official acting

within his discretionary authority is immune from suit unless his conduct "violates

clearly established [federal] statutory or constitutional rights of which a reasonable

person would have known." *Keating v. Miami*, 598 F.3d 753, 762 (11th Cir. 2010)

(quoting *GJR Invs., Inc. v. Cty. Of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998),

*overruled on other grounds, as recognized in Randall v. Scott*, 610 F.3d 701, 709

(11th Cir. 2010) (alteration in original)). To establish entitlement to qualified

immunity, the "public official must first prove that he was acting within the scope

of his discretionary authority when the allegedly wrongful acts occurred . . . . Once

the defendant establishes that he was acting within his discretionary authority, the

burden shifts to the plaintiff to show that qualified immunity is not appropriate."
*Penley ex. Rel. Estate of Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010)
(quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

"To determine whether an official was engaged in a discretionary function,
[courts] consider whether the acts the official undertook are of a type that fell
within the employee's job responsibilities." *Crosby v Monroe Cty*, 394 F.3d 1328,
1332 (11th Cir. 2004). In applying this test, courts look to the "general nature of the
defendant's action, temporarily putting aside the fact that it may have been
committed for an unconstitutional purpose, in an unconstitutional manner, to an
unconstitutional extent, or under constitutionally inappropriate circumstances."
*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). "[T]he
determination that an officer was acting within his discretionary authority is quite
a low hurdle to clear." *Godby v. Montgomery Cty Bd. of Educ.*, 996 F. Supp. 1390,
1401 (M.D. Ala. 1999).

Then, to determine whether the plaintiff meets his burden to establish that
qualified immunity is not appropriate, the Supreme Court has established a two-
part test and has granted the district court discretion about the order in which it
addresses each part. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). Under one
part of the test, a court considers "whether [the] plaintiff's allegations, if true,

establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Under the other part, a court considers whether the constitutional violation was clearly established at the time of the alleged wrongful conduct. *Saucier*, 533 U.S. at 201. The officer is entitled to qualified immunity unless the plaintiff establishes both parts of the test. *See Pearson v. Callahan*, 555 U.S. 223, 236-44 (2009).

The two parts of the test are designed to provide an over-arching concept of fair warning: "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Salvato v. Miley,* 790 F.3d 1286, 1292 (11th Cir. 2015) (quoting *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014)). "We do not require a case directly on point, but an existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). Put another way, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The doctrine of qualified immunity "gives government

officials breathing room to make reasonable but mistaken judgments."
*Ashcroft,* 563 U.S. at 743.

### 1. Deputy Jimmy Ward

As alleged, the claim against Deputy Ward arises from his duties as a deputy sheriff responding to a police pursuit. This means that Deputy Ward was acting in the scope of his discretionary authority. *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995).

The court now turns to the two-step inquiry for determining whether Deputy Ward is entitled to qualified immunity. *See Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988). For the reasons to follow, the court answers that question in the negative at the motion to dismiss stage.

Duncan alleges that Deputy Ward acting under color of law used unwarranted lethal force that amounted to deliberate indifference to Duncan's Fourth Amendment rights. He contends that Deputy Ward's conduct constituted an excessive use of force upon, and an objectively unreasonable seizure of, Duncan in violation of his rights under the Fourth and Fourteenth Amendments.

"[A] claim of 'excessive force in the course of making [a] . . . 'seizure' of [the] person . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard.'' *Scott v. Harris*, 550 U.S. 372, 381 (2007) (last five

alterations in original) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). Thus,

"'[t]he question is whether the officer's conduct is objectively reasonable in light of

the facts confronting the officer.'" *Crenshaw v. Lister,* 556 F.3d 1283, 1290 (11th

Cir. 2009) (per curiam) (alteration in original) (quoting *Vinyard v. Wilson,* 311 F.3d

1340, 1347 (11th Cir. 2002)). "Use of force must be judged on a case-by-case basis

from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

"'Determining whether the force used to effect a particular seizure is

"reasonable" under the Fourth Amendment requires a careful balancing of the

nature and quality of the intrusion on the individual's Fourth Amendment interests

against the countervailing governmental interests at stake.'" *Crenshaw,* 556 F.3d at

1290 (quoting *Graham,* 490 U.S. at 396). "This analysis 'requires careful attention

to the facts and circumstances of each particular case, including the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight.'" *Id.* (quoting *Graham,* 490 U.S. at 396).

An intentional seizure of a person "readily bears the meaning of a laying on

of hands or application of physical force to restrain movement, even when it is

ultimately unsuccessful." *California v. Hodari D.,* 499 U.S. 621, 626 (1991). "While

it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner,* 471 U.S. at 7 (citing *United States v. Mendenhall*, 446 U.S. 544 (1980)). Relevant to this case, the Court has recognized that it is constitutionally permissible for an officer to use deadly force when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11.

Here, Plaintiff contends that Deputy Ward violated his right to be free from unreasonable seizure when he used excessive force. Specifically, Plaintiff alleges Ward "simply began shooting" when he stepped "out of the car with his hands up and gun in the air, as he was attempting to do, and without giving any verbal commands or warnings." (Doc. 48 at 9.) Defendant Deputy Ward's motion to dismiss is due to be denied as to the 42 U.S.C. § 1983 excessive force claim in his individual capacity. In so holding, this Court rejects Deputy Ward's qualified immunity defense at the motion to dismiss stage.

In the context of a claim for excessive force in violation of the Fourth Amendment, the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. *Thornton v City of Macon*, 132 F.3d 1395, 1400

(11th Cir. 1998). The court recognizes that "[a]n officer will be entitled to qualified immunity if his actions were objectively reasonable-that is, if a reasonable officer in the same situation would have believed that the force used was not excessive." *Thornton*, 132 F.3d at 1400. However, the court cannot determine as a matter of law based on the allegations of the Plaintiff's third amended complaint that this standard has been met.

Accepting the facts alleged in the complaint as being truthful, the court cannot hold as a matter of law that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Consequently, at this stage of the litigation, the court cannot rule as a matter of law that Deputy Ward is entitled to the defense of qualified immunity. *See Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997) (indicating that qualified immunity is typically addressed at the summary judgment stage of the case). This Court concludes that Deputy Ward's motion to dismiss based upon qualified immunity is due to be DENIED.

### 2. Sheriff Wade

Duncan alleges that Sheriff Wade failed to adequately train his Bibb County Sheriff's Deputies in the use of force and the provision of emergency medical care. The Third Amended Complaint asserts that failure to train in those areas amounted to deliberate indifference and resulted in the deprivation of Duncan's Fourth

Amendment rights. Sheriff Wade asserts qualified immunity against both claims. The Court finds that Sheriff Wade was acting within the scope of his discretionary authority when these allegedly wrongful acts occurred because Duncan's claims against Sheriff Wade arise from his status as supervisor over Deputy Ward. Therefore, this court finds that Sheriff Wade was acting within his discretionary authority. Accordingly, Sheriff Wade is entitled to qualified immunity unless Duncan sufficiently alleges facts that, if true, establish both parts of the qualified immunity test.

As a preliminary matter, the Court recognizes that, although the failure to train in the use of force and the failure to train in the provision of emergency medical care can be separate claims, the same standard for liability applies to both, so the court will address them together. *See Gold v. Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (addressing claims for "failure to train or supervise" together). Duncan alleges that the decision by Deputy Ward to shoot him while he was attempting to give himself up peacefully, without warning or other verbal commands and without attempting de-escalation measures, is a result of Sheriff Wade's failure to train Deputy Ward properly on de-escalation measures and the proper use of deadly force. He contends that this allegation states a claim that Sheriff Wade failed to train his officers regarding the lawful use of force.

The remaining claim asserted against Sheriff Wade in Count Three is the failure to train his deputies in emergency medical care. Duncan alleges that the cancellation of the helicopter air-lift that was originally called to provide paramedic services to Duncan and the inability of the Bibb County Sheriff's Deputies to properly provide emergency medical care for citizens injured by the use of excessive and/or deadly force is also a result of Sheriff Wade's failure to train emergency medical care.

In both instances, Duncan contends that Sheriff Wade instituted a policy or custom of failing to train his deputies that amounts to conscious and deliberate indifference to the rights of persons with whom Bibb County Sheriff's Deputies come into contact. Ultimately, he contends that this resulted in the deprivation of his Fourth Amendment rights.

Duncan's argument—that the alleged unconstitutional acts of a single officer during a single incident necessarily equal a supervisor's failure to train—effectively calls for the imposition of *de facto respondeat superior* or vicarious liability. Theories of liability that the Supreme Court and the Eleventh Circuit have repeatedly refused to impose under § 1983. *See Iqbal*, 556 U.S. at 677 ("In a § 1983 suit . . . – where masters do not answer for the torts of their servant – the term 'supervisory liability' is a misnomer"); *City of Canton*, 489 U.S. at 391 (explaining

that letting the existence of a random deficiency or officer shortcoming support a failure to train claim would mean imposing "*de factor respondeat superior"* liability on the municipality and municipal supervisors, a liability that the Court has repeatedly rejected).

This sort of liability would "engage the federal courts in an endless exercise of second-guessing municipal employee-training programs," which is an exercise "the federal courts are ill suited to undertake" and which "would implicate serious questions of federalism." *City of Canton,* 489 U.S. at 392. ("Absent vicarious liability, each government officer, his or her title notwithstanding, is only liable for his or her own misconduct."); *Keating* 598 F.3d at 762 ("It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or respondeat superior.").

Rather, a supervisor is only liable for his subordinates' acts when he personally participates in them or where a causal connection exists between his own actions and the constitutional violation. *Id.* A causal connection can be established under the three following circumstances: evidence of (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," (2) the supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights," or (3) "facts support

an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cotton v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Id.* at 1360-61. "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Keith v. DeKalb Cty, Ga.*, 749 F.3d 1034, 1048 (11th Cir. 2014).

A government entity "may be held liable under Section 1983 when a governmental 'policy or custom' is the 'moving force' behind the constitutional deprivation." *Farred v. Hicks*, 915 F.2d 1530, 1532-33 (11th Cir. 1990) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Monell*, 436 U.S. at 694. A Plaintiff must do more than recite conclusory statements that a policy exists, or a particular custom was tolerated – factual matters must be alleged to support such assertions. *See, e.g.*, *Barr v. Gee*, 437 F. App'x. 865, 874-75 (11th Cir. 2011). Here, Duncan relies only on the conduct of Deputy Ward to impute liability onto Sheriff Wade, which he cannot do.

Duncan did not allege that Wade knew of *prior* incidents of improper use of excessive force or providing improper medical care involving Deputy Ward, or

indeed, any of the Bibb County's Sheriff Deputies, and Wade failed to act. Duncan does not allege that Wade was on the scene at the time of the March 4, 2018 incident, in a position to stop that incident, and yet failed to do so. In addition, Duncan's Third Amended Complaint contains no allegation of incidents of excessive force or improper medical care *prior* to March 4, 2018, that would have notified Sheriff Wade of the need for additional training in these areas. Rather, Duncan merely assumes that because a single alleged incident of excessive force and improper medical care occurred involving a single officer under Sheriff Wade's supervision, then a lack of training must have also occurred.

If the court were to accept this argument, then anytime a plaintiff alleges any incident—even one involving only a single officer—of excessive force or improper emergency medical care, such an allegation would also demonstrate a failure to train. However, the Supreme Court has instructed that "adequately trained officers occasionally make mistakes" and "the fact that they do says little about the training program . . . ." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

Duncan has failed to allege any facts showing a causal connection between the occurrence and any custom or policy of Sheriff Wade that amounts to deliberate indifference toward Duncan's constitutional rights. Duncan did not allege that Sheriff Wade participated in any of the acts that injured him or allowed

his injuries to worsen. He did not allege that Sheriff Wade directed Deputy Ward to act unlawfully, nor did he allege any facts indicating that Sheriff Wade knew of Deputy Ward's potential for unlawful conduct yet failed to take preventative measures. Duncan also did not allege a history of widespread misfeasance in the Bibb County Sheriff's Department.

Instead, Duncan alleges in a general and conclusory fashion that Sheriff Wade instituted a custom or policy of deliberately failing or refusing to adequately train or instruct his deputies how to: (1) deescalate situations involving armed, nonthreatening citizens and (2) provide emergency medical care for injured citizens from the use of deadly force. These allegations, however, are not supported by any facts, other than a recitation of the incident involving the Plaintiff himself.

Simply alleging the elements necessary to state a claim against a governmental entity, without alleging facts to support those elements, is insufficient for purpose of surviving a motion to dismiss. *See, e.g., Gray v. City of Roswell*, 486 F. App'x. 798, 800-01 (11th Cir. 2012)(holding that while a municipality may be liable under § 1983 when an official policy or custom causes a constitutional violation, a plaintiff cannot survive a motion to dismiss where she "does not recite any facts or policies that would support a claim against the City," but instead makes

"threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." (quotation omitted)).

Lastly, Plaintiff has failed to sufficiently allege how Sheriff Wade failed to train his officers on the appropriate circumstances as to when to use deadly force or provide emergency medical care. "[I]nadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference . . . ." *See City of Canton* 489 U.S. at 388. "To establish 'deliberate indifference' or a 'deliberate or conscious choice,' a plaintiff must present some evidence that the [Sheriff] knew of a need to train and/or supervise in a particular area and the [Sheriff] made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350-51 (11th Cir. 1998). "Further, the Eleventh Circuit requires 'proof that the City was aware of a prior incident in which constitutional rights were similarly violated.'" *Lang v. City of Largo*, 2006 WL 889990, at *2 (M.D. Fla. 2006)(quoting and citing *Church v. Huntsville*, 30 F.3d 1332, 1342-46 (11th Cir. 1994)). As previously discussed, there is no facts alleged by the Plaintiff that would put Sheriff Wade on notice of a need to train in the use of force or emergency medical care.

Here, Duncan has alleged nothing other than bald assertions to suggest that Sheriff Wade was "deliberately indifferent" to his rights. Indeed, Duncan's sole

allegation is based on the lone incident involving himself. To state a claim, Duncan must allege facts to support his theory of liability. *See Hall v. Smith*, 170 F. App'x. 105, 108 (11th Cir. 2006) ("Because Hall alleged no factual support for his conclusory statement that the City had a policy or custom of grossly inadequate supervision and training of its employees, the district court did not err in dismissing Hall's claims against the City.").

In sum, Duncan's Third Amended Complaint fails to allege that Sheriff Wade violated federal constitutional or statutory law as to the use of excessive force or providing emergency medical care. Therefore, Duncan's allegations fail to establish the first part of the qualified immunity test, and he fails to meet his burden to establish that Sheriff Wade is not immune. The court finds that Sheriff Wade is entitled to qualified immunity as to the federal claims asserted against him in his individual capacity based on the failure to train excessive force or emergency medical care. Accordingly, all claims against Sheriff Wade in his individual capacity are due to be dismissed.

### 3. Officer Gray

Plaintiff also brings a § 1983 claim against Officer Gray, alleging false arrest in violation of his Fourth and Fourteenth Amendment rights.[4] Duncan alleges that Officer Gray pulled him over without probable cause and attempted to arrest him under false pretenses, thereby leading to the police pursuit and the physical injuries that Duncan suffered. Officer Gray has asserted qualified immunity as to this claim.

Under the Fourth Amendment, "a police officer may stop a vehicle '[w]hen there is … probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations' relating to the operation of motor vehicles." *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990) (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979))."Whether probable cause exists is 'viewed from the standpoint of an objectively reasonable police officer . . . .'" *United States v. Chanthasouxat,* 342 F.3d 1271, 1276 (11th Cir. 2003).

A traffic stop also comports with the Fourth Amendment when a law enforcement officer has "reasonable suspicion" to believe that criminal activity "may be afoot." The Supreme Court articulated the reasonable suspicion standard for analyzing the validity of a traffic stop in *Terry v. Ohio,* 392 U.S 1

---

[4]      The Fourth Amendment is applicable to the states through the Fourteenth Amendment. *See Michigan v. Summers*, 452 U.S. 692, 694 n.2 (1981).

(1968). *See United States v. Arvizu,* 534 U.S. 266, 273 (2002). "[T]he police may stop and briefly detain a person to investigate a reasonable suspicion that he is involved in criminal activity, even though probable cause is lacking." *United States v. Williams,* 876 F.2d 1521, 1523 (11th Cir. 1989). "[R]easonable suspicion is determined from the totality of the circumstances and from the collective knowledge of the officers involved in the stop." *Williams,* 876 F.2d at 1523. Furthermore, "[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)(citing *Terry,* 392 U.S. at 30). In sum, "a traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry* or probable cause to believe a traffic violation has occurred under [*Whren v. United States*, 517 U.S. 806, 810 (1996)]." *Chanthasouxat,* 342 F.3d at 1275.

Moreover, in the context of the Fourth Amendment, when a defendant raises the defense of qualified immunity, the standard is not actual probable cause or actual reasonable suspicion, but "arguable" probable cause/reasonable suspicion. *Madiwale v Savaiko,* 117 F.3d 1321, 1324 (11th Cir. 1997). Under the qualified immunity inquiry, the issue for determining whether Plaintiff has alleged

a Fourth Amendment violation is whether an objectively reasonable officer in the same circumstances and possessing the same information as the defendant *could have believed* that probable cause or reasonable suspicion existed. *See Crosby v. Monroe County,* 394 F.3d 1328, 1332–33 (11th Cir. 2004) (arguable probable cause exists "if, under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present").

In wrongful arrest cases, the Eleventh Circuit has defined the "clearly-established" prong as an "arguable probable cause" inquiry. *See id.* ("If a constitutional violation occurred because the officer lacked probable cause, we next consider whether arguable probable cause existed."). The "clearly-established" standard means that even if the arresting officer lacks probable cause, he is still entitled to qualified immunity if there was "arguable probable cause for the arrest, which is a more lenient standard than probable cause." *Knight v. Jacobson,* 300 F.3d 1272, 1274 (11th Cir. 2002).

As an initial matter, the Court must determine whether Officer Gray was acting in his discretionary authority when he initiated the traffic stop. *See Penley*, 605 F.3d at 849. In general, an officer conducting a traffic stop is a discretionary act for the purposes of qualified immunity. *See, e.g.*, *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1268 (11th Cir. 2010) (stating that police investigations and arrests

usually are considered discretionary functions). Therefore, the Court finds that Officer Gray acted in his discretionary authority when he initiated a traffic stop based on the height of Duncan's rear-view mirror.

Next, the burden shifts to the Plaintiff to show that Officer Gray violated his (1) constitutional rights that were (2) clearly established. *See Hope*, 536 U.S. at 736; *see also Saucier*, 533 U.S. at 201. Duncan alleges that Officer Gray pulled him over because his car's rear-view mirror was "too low," something Duncan insists is not an infraction under Alabama law. Additionally, Duncan alleges Officer Gray committed false arrest by lying to Duncan about outstanding warrants for his arrest, when no such warrants existed at that time.

Officer Gray argues he is entitled to the affirmative defense of qualified immunity because he did not violate a clearly established constitutional right. Moreover, Officer Gray argues that he had at least arguable probable cause to arrest Duncan for the offense of fleeing or attempting to elude a police officer when Duncan drove off from the initial traffic stop as defined by Code of Alabama, § 32-5A-193(a) (1975). Essentially, Officer Gray argues that Duncan's reaction to the *alleged* illegal traffic stop "is itself a new, distinct crime, [and therefore,] the police constitutionally may arrest the [suspect] for that crime." *United States v. Bailey,* 691 F.2d 1009, 1017 (11th Cir. 1982). Under the relevant section of the statute:

> [a]ny driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle, when given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a misdemeanor. The signal given by the police officer may be by hand, voice, emergency light or siren.

Ala. Code. § 32-5A-193(a) (1975).

However, the Alabama Code section relied upon by Officer Gray (Ala. Code § 32-5A-193) was *repealed* in 2009. Duncan instead relies upon, Ala. Code § 13A-10-52, which similar to the statute cited by Officer Gray, makes it a crime to flee or attempt to elude a law enforcement officer. A companion section, Ala. Code § 13A-10-53, provides an affirmative defense to prosecution where the underlying arrest from which the suspect flees is unlawful. Here, Duncan alleges that 1) Officer Gray lied when he represented to Duncan that there were warrants outstanding for Duncan's arrest during the initial traffic stop, and 2) Duncan knew that no such warrants existed. Based on these allegations, Duncan argues that he could not have committed a new crime under Alabama law merely by fleeing from the initial traffic stop with Officer Gray because that initial arrest was an unlawful pretext based upon no valid law. Therefore, Duncan argues that fact, combined with an unlawful arrest to be an affirmative defense to prosecution for fleeing from the initial traffic stop with Officer Gray under Ala. Code § 13A-10-53.

Assuming that Duncan did not commit a new crime merely by fleeing the scene, his false arrest claim still turns on whether Officer Gray violated Duncan's clearly established rights through the initial traffic stop. Alabama law provides certain guidelines for the placement of rear-view mirrors, explaining that:

> Every motor vehicle, operated singly or when towing any other vehicle, shall be equipped with a mirror so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of such motor vehicle.

Alabama Code § 32-5-214. According to Duncan's Third Amended Complaint, Officer Gray justified the traffic stop by noting that Duncan's rear-view mirror was "too low**."** (Doc. 48 at 14.) Duncan alleges no additional facts that elaborate on the mirror's actual height or whether the mirror was "so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear" of Duncan's vehicle. Ala. Code § 32-5-214. It is feasible that a rear-view mirror could be located "too low" to offer the unimpeded view required by Alabama law, and Duncan has failed to foreclose that possibility through specific factual allegations. In other words, Duncan has failed to plead specific facts to demonstrate that his mirror was located in a manner to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of his vehicle.

Duncan's reliance on the reasoning of *United States v. Chanthasouxat* is unavailing. In *Chanthasouxat*, the Eleventh Circuit held that an officer's mistaken

belief that Alabama law required a rear-view mirror to be placed on the inside of the vehicle did not justify the initial traffic stop. 342 F.3d 1271, 1279-80 (11th Cir. 2003). Ultimately, the Court held that "[b]ecause [the arresting officer's] mistake of law cannot provide the objective basis for reasonable suspicion or probable cause, we conclude that the traffic stop at issue violated the Fourth Amendment." *Id.* at 1280. Plaintiff alleges that the facts in *Chanthasouxat* are identical to those in this case because the officer's mistaken belief in *Chanthasouxat* could not give rise even to arguable probable cause.. And therefore, Plaintiff concludes that Officer Gray is  not entitled to qualified immunity for the unconstitutional traffic stop**.**

The facts of *Chanthasouxat* are readily distinguishable from those in the instant case. In *Chanthasouxat*, the officer's mistake of law was apparent from the complaint: either the law required a rear-view mirror to be placed on the inside of a vehicle, or it did not. No further factual allegations were needed to show that the officer's stated reasoning for initiating the traffic stop was unreasonable as a matter of law. By contrast, Officer Gray initially stopped Duncan because his rear-view mirror was "too low." This reasoning does not lend itself to the simple yes/no dichotomy of the alleged mistake of law in *Chanthasouxat*. It is possible that Duncan's rear-view mirror could be "too low" so that it would not provide a "view

of the highway for a distance of at least 200 feet to the rear of such motor vehicle."
Alabama Code § 32-5-214.

Therefore, the Third Amended Complaint fails to allege that Duncan made an initial traffic stop based on a mistake of law because it is possible that Duncan's mirror was hanging "too low" in violation of Alabama Code § 32-5-214. This is a major distinction from the facts in *Chanthasouxat*, where the officer's mistake of law was clear from the Plaintiff's complaint. Here, the facts alleged by the Plaintiff actually show Officer Gray's initial traffic stop was not based on mistake of law, but based on a potential violation of an Alabama traffic law. Thus, Officer Gray had at least arguable probable cause to stop Duncan's vehicle because according to Duncan's Third Amended Complaint – it is possible that Duncan was violating an Alabama traffic law regarding the height of his rear-view mirror. Ultimately, Duncan has failed to satisfy the "clearly established" prong because a traffic stop is a constitutional detention justified by probable cause when Officer Gray believed a traffic violation had occurred.

In sum, Duncan failed to show that Officer Gray initiated an unlawful traffic stop and thereby violated his clearly established constitutional rights. As a result, the Court finds that Officer Gray is entitled to qualified immunity. Plaintiff's claim against Officer Gray in his individual capacity is due to be dismissed.

**D. City of Centreville**

To the extent that Plaintiff seeks to bring a claim against the City of Centreville pursuant to 42 U.S.C. § 1983, he must overcome the "strict limitations on municipal liability" which the United States Supreme Court has put in place. *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998). Under § 1983, there is no *respondeat superior* liability; a municipality may not be sued under § 1983 for the acts of others. *See Monell v. Dept. of Social Servs.,* 436 U.S. 658, 691-94 (1978); *Gold,* 151 F.3d at 1350 (municipality may not be liable for the wrongful actions of its police officers pursuant to a *respondeat superior* theory of liability).

A municipality may only be liable for the tortious acts of its employees if action taken "pursuant to official municipal policy" results in a deprivation of a federally protected right. *Monell*, 436 U.S. at 691. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986).

"'[O]fficial policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances over time." *Pembaur*,

475 U.S. at 480–81. It also includes actions of a policymaker that are representative of official government policy. *See Monell*, 436 U.S. at 694. Additionally, it includes situations where a policymaker's "failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton*, 489 U.S. at 390.

This third line of so-called failure-to-train liability is especially rare. *See City of Canton*, 489 U.S. at 387 (noting "that there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983"). That is because the failure to train must be the "moving force" behind the constitutional violation in order to establish municipal liability under § 1983. *Monell*, 436 U.S. at 694. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389.

To determine whether a failure to train amounts to a deliberate or conscious choice by a municipality, courts are instructed to look at the "degree of fault" of a municipality's failure to  train. *City of Canton*, 489 U.S. at 388. "Only where a municipality's failure to train  its  employees  in  a  relevant  respect  evidences  a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*

With respect to police officer training, the deliberate indifference standard is appropriately a high threshold. *See id.* at 391 (finding that adopting a lesser standard of fault and causation would "engage the federal courts in an endless exercise of second-guessing municipal employee training programs[,] . . . an exercise we believe the federal courts are ill suited to undertake . . . ."). Nevertheless, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need*." Id.* at 390 (emphasis added).

Ordinarily, to make out a prima facie showing of deliberate indifference with respect to police training, a plaintiff must allege a pattern of similar constitutional violations that would put the municipality on notice of its inadequate training. *See Connick*, 563 U.S. at 62 ("Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability.") (internal quotations and citations omitted); *see also Wright v. Sheppard*, 919 F.2d 665 (11th Cir. 1990) (finding "no evidence of a history of widespread prior abuse

by [Sheriff's] Department personnel that would have put the sheriff on notice of the need for improved training or supervision").

In the alternative, the Supreme Court, in *City of Canton v. Harris*, left open the possibility that "in a narrow range of circumstances" a plaintiff may proceed on a failure to train claim based upon a single incident of misconduct. *Brown*, 520 U.S. at 409. The Supreme Court, in *City of Canton*, posed the hypothetical of a municipality that failed to train its police officers on the use of deadly force. *See* 489 U.S. at 390, n.10. It reasoned that, given the fact that policymakers know that police officers are required to shoulder deadly weapons and may be required to use them to protect the public from fleeing felons, the need to train police officers on the constitutional limitations of the use of deadly force would be so obvious that a failure to do so would amount to deliberate indifference. *Id.*

Eight years later, the Supreme Court, in *Brown*, clarified that a plaintiff could succeed on a theory of so-called "single-incident" liability if he alleged "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Brown*, 520 U.S. at 409. The *Brown* Court reasoned further:

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*Brown*, 520 U.S. at 409. Accordingly, single-incident liability is predicated on (1) the likelihood that a police officer will be confronted with a specific situation and (2) the predictability that an officer, when confronted with that situation, will violate a person's constitutional rights. *See id.*

Plaintiff alleges that Centreville instituted a custom or policy of deliberately failing or refusing to adequately train or instruct its officers how to properly provide emergency medical care for citizens injured by the use of excessive and/or deadly force. In this case, Duncan's allegations are merely conclusory statements of the elements of the cause of action for failure to train emergency medical care. Duncan alleges that Centreville knew, or should have known, that their officers/deputies would encounter situations where a person was seriously harmed and in need of

emergency medical care. Duncan further alleges that Centreville's failure to train emergency medical care amounts to conscious and deliberate indifference to the rights of person with whom . . . Centreville police officers come into contact. These allegations are not "detailed factual allegations," but rather are mere conclusions. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.")

Duncan has not alleged any facts showing a history of constitutional violations against persons injured by the use of excessive force such that the need for training emergency medical care would have been so obvious to Centreville that a failure to train amounted to deliberate indifference towards the constitutional rights of such persons. Although Duncan alleges that Centreville police officers encountered situations where a person was seriously harmed and in need of emergency medical care, Duncan has not alleged how often, if at all, those encounters resulted in constitutional violations. Moreover, Duncan has not alleged facts to support an allegation that it is a highly predictable consequence of Centreville's failure to train that police officers would violate the constitutional rights of these individuals. Accordingly, Duncan has not pled sufficient facts to

support a plausible inference that Centreville's failure to train amounted to deliberate indifference.

Accordingly, Duncan's claim against the City of Centreville for failure to train emergency medical care is due to be dismissed.

## IV.  Conclusion

For the reasons stated above, Defendants Wade, Gray, and Centreville's motions to dismiss Duncan's Third Amended Complaint are GRANTED and Defendant Ward's motion to dismiss Duncan's Third Amended Complaint is DENIED.

**DONE** and **ORDERED** on July 9, 2020.

L. Scott Coogler
United States District Judge

201416