UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| Ricky Duncan, | ) |
| Plaintiff, | ) |
| vs. | ) 7:19-cv-00447-LSC |
| Deputy Jimmy Ward, *et al.*, | ) |
| Defendants. | ) |

# MEMORANDUM OF OPINION

Police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Deputy Jimmy Ward and Officer Shane Deason made a split-second judgment to use deadly force when, after an extended car chase, the plaintiff stepped out of his vehicle with a loaded firearm in hand. Because their use of force was reasonable and consistent with clearly established law, their motions for summary judgment are due to be granted.[1]

---

[1] Duncan concedes "summary judgment is proper" on his claims against the City of Brent. (Doc. 111 at 16.) All claims against the City of Brent are therefore due to be dismissed.

# I

Viewed in the light most favorable to the plaintiff, the facts are as follows.[2]

On the morning of March 4, 2018, Officer Jim Gray of the Centerville Police Department stopped a 2003 Buick Century. The Buick had two occupants: Ricky Duncan and a female passenger.

After learning about an outstanding warrant for Duncan's arrest, Officer Gray ordered him to "step out of the car." But rather than comply, Duncan screamed, cursed, and warned Officer Gray to not "f****** touch [his] god d*** car." He also called Officer Gray a "mother f*****" and swore he was "not going to jail for this s***."

After defying eleven orders to "step out" and submit to arrest, Duncan shut his vehicle's door and drove away. Officer Gray pursued. For several miles he and other officers—including Deputy Jimmy Ward of the Bibb County Sheriff's Department and Officer Shane Deason of the Brent Police Department—chased Duncan down city streets and state highways.

---

[2] The Court gleans these "facts" from the parties' submissions of facts claimed to be undisputed, the parties' responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Eventually the chase ended. Duncan turned down a dirt road, stopped, opened his door, and stepped out of his vehicle. The officers also stopped, exited their own vehicles, drew their service weapons, and ordered Duncan to "show his hands." Officers then noticed a pistol in Duncan's left hand. Deputy Ward and Officer Deason opened fire. Ward fired nine times and Deason fired once. Duncan sustained gunshot wounds to his right calf, his right shoulder, his left wrist, and to the left side of his neck.

Duncan survived his injuries and filed claims under 42 U.S.C. § 1983 and Alabama tort law. He alleges, among other things, that Deputy Ward and Officer Deason violated his Fourth Amendment right to be free from excessive force.[3] Deputy Ward and Officer Deason moved for summary judgment.

## II

A successful summary judgment motion shows there is no genuine dispute as to any material fact and that the plaintiff deserves judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists, and summary judgment is not appropriate, if "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth*

---

[3] The Court dismissed some defendants and several claims at the motion-to-dismiss stage. (Doc. 71.)

*Tellecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)).

At summary judgment district courts view all evidence and draw all justifiable inferences in the nonmoving party's favor. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). Then we determine "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250–51 (1986).

### III

Deputy Ward and Officer Deason moved for summary judgment on Duncan's excessive-force claims. Both believe their use of force was a reasonable and lawful response to Duncan's conduct. They alternatively argue that their use of force, even if excessive, violated no clearly established law. This Court agrees on both fronts.

First to the merits. The Fourth Amendment's "reasonableness standard" governs Duncan's excessive-force claims. *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). This standard "requires a careful balancing of the nature and quality of the intrusion on [Duncan's] Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* (quoting *Graham*, 490 U.S. at 396). It asks whether a reasonable officer in Deputy Ward and Officer Deason's situation would

believe the level of force used was "necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1186 (11th Cir. 2001)). If the answer to that question is yes, then a plaintiff's excessive-force claim fails as a matter of law.

To evaluate the reasonableness of an officer's use of force, the Court considers a variety of factors, including "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Perspective is crucial: "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

Deputy Ward and Officer Deason did not use excessive force. Three factors weigh in their favor. For one, Duncan resisted and evaded arrest. He defied Officer Gray's orders, he led officers on an extended car chase, and he gave no indication of surrender. Second, a reasonable officer would believe Duncan posed an immediate threat to officer safety. After all, he stepped out of his vehicle with a loaded firearm in hand; multiple officers were exposed and within range of Duncan's weapon. Third, nothing suggests Deputy Ward and Officer Deason continued firing once the threat abated. Nothing, for instance, suggests they continued firing once Duncan

dropped his firearm or surrendered to arrest. *See Plumhoff*, 572 U.S. at 778 ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat is over."). Considering each of these factors, any reasonable officer in the same situation—any reasonable officer in range of a noncompliant and armed suspect—would respond with comparable force. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *Hunter v. City of Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019) ("It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself.").[4]

This was precisely the "tense, uncertain, and rapidly evolving" situation envisioned by the Supreme Court in *Graham*, 490 U.S. at 397. Because Deputy

---

[4] Although Duncan claims he stepped out with his pistol "straight up into the air," the position of his firearm does not affect the Fourth Amendment analysis. Even if he hadn't trained his firearm on Deputy Ward and Officer Deason, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). The only relevant question is whether, "given the circumstances, [Duncan] would have appeared to reasonable police officers to have been gravely dangerous." *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002). And the answer to *that* question is yes: He was armed, noncompliant, nothing suggested he planned to surrender, and, rather than step out of the car with empty and raised hands, he stepped out with a loaded pistol.

Ward and Officer Deason responded lawfully and consistent with the demands of the Fourth Amendment, Duncan's excessive-force claims fail as a matter of law.

But even if Deputy Ward and Officer Deason used excessive force, their motions for summary judgment are due to be granted. Both are entitled to qualified immunity.

Qualified immunity shields federal and state officials from money damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right becomes clearly established when the contours of the right are so clear a reasonable officer "would understand that what he is doing violates the law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). So even if an officer uses excessive force and violates a suspect's constitutional rights, he remains immune from 42 U.S.C. § 1983 liability unless "existing precedent [has] placed the statutory or constitutional question beyond debate." *Id.* (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018)).

A plaintiff can show a right was clearly established in one of three ways. *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009). First, he can point the Court to a "materially similar case that has already been decided." *Echols v. Lawton*, 913 F.3d 1313, 1324–25 (11th Cir. 2019) (citing *Loftus v. Clark-*

*Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)). Second, he can point the Court to a "broader, clearly established principle that should control the novel facts of the situation." *Id.* Third, "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." *Id.* Duncan's arguments fail under all three approaches.

Duncan has not cited a "materially similar case" showing Deputy Ward and Officer Deason violated a clearly established right. He relies on two cases: an unpublished Eleventh Circuit opinion and a district court opinion from Georgia. But as a matter of law, neither case can clearly establish a right. *See Bailey v. Wheeler*, 843 F.3d 473, 483–484 (11th Cir. 2016) (explaining how only binding precedents from the Supreme Court, the Eleventh Circuit, or the Supreme Court of Alabama are relevant to a qualified-immunity analysis). And even if the Court considered Duncan's nonprecedential authority, both cases are readily distinguishable. The first—*Greer v. Ivey*, 767 F. App'x 706 (11th Cir. 2019)—involved a mentally ill plaintiff who may (or may not) have had a knife in hand when officers shot him. The second—*Brown v. Newton County Sheriff's Office*, 273 F.Supp. 3d 1142 (N.D. Ga.)—involved a suicidal plaintiff whom officers shot after they "got into safe and protected positions." Neither case involved (1) a noncompliant suspect (2) armed with a loaded handgun and (3) within range of exposed officers.

The most analogous precedent actually cuts against Duncan's claims. In *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010), officers chased two suspects in cars and on foot. *Id*. An officer caught up with the suspects and saw one "holding a gun and standing eight to ten feet away." *Id*. at 819. Without warning, the officer fired fourteen bullets; eight of them struck the suspect. *Id*. The shot suspect then filed an excessive-force claim, and the district court denied the officer's motion for summary judgment. In reversing the district court, the Eleventh Circuit found:

> Officer Gutierrez reasonably responded with deadly force, and he was not required to interrupt a volley of bullets until he knew that Jean-Baptiste had been disarmed. Officer Gutierrez faced more than a possibility of harm. Officer Gutierrez was confronted by a suspect of a dangerous crime who was lying in wait and holding a gun. Until Officer Gutierrez verified that Jean-Baptiste was disarmed, Officer Gutierrez had no reason to trust that Jean-Baptiste would not suddenly attempt to do him harm.

*Id*. at 822. Like the officer in *Jean-Baptiste*, Deputy Ward and Officer Deason "faced more than a possibility of harm." *Id*. They faced an armed and resisting suspect and "had no reason to trust that [Duncan] would not suddenly attempt to do [them] harm." Deputy Ward and Officer Deason, like the officer in *Jean-Baptiste*, were "forced to decide in a matter of seconds whether to employ deadly force." *Id*. at 821. This Court will not second-guess their decision with the 20/20 vision of hindsight. *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010).

Just as no analogous precedent supports Duncan's claim, no "broader, clearly established principle" placed Deputy Ward and Officer Deason on notice that their conduct violated the Fourth Amendment. *Echols*, 913 F.3d at 1324. Duncan argues the following: "It has been clearly established that shooting a person . . . who did not pose an immediate danger violates the Fourth Amendment." His argument fails for two reasons. For one, a reasonable officer in Deputy Ward and Officer Deason's situation could, for the reasons explained above, believe Duncan posed an immediate danger to officer safety.

Second, Duncan's broad principle is far too broad to defeat qualified immunity. The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citations and internal quotation marks omitted). Specificity "is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Duncan's proposed rule—that, as a matter of law, an officer violates the Fourth Amendment when he shoots an armed suspect who "does not pose an immediate danger"—offers little guidance to officers in the field. *Cf.*

*Bennett v. Hendrix*, 423 F.3d 1247, 1255 (11th Cir. 2005). When does a suspect pose an immediate danger? And how much immediate danger justifies a shooting?

Finally, this case does not fall within the narrow class of cases where an officer "so obviously violate[d] the [C]onstitution that prior case law is unnecessary" to clearly establish a right. *Loftus*, 690 F.3d at 1205. Although in "extreme factual circumstances" a plaintiff can show a clearly established right without a close factual analogue, *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1232 (11th Cir. 2020), these circumstances are few and far between. *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) ("Our case law has made clear that 'obvious clarity' cases will be rare."). For qualified-immunity's obviousness exception to apply in an excessive-force case, the plaintiff must show the officer's conduct "was so far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution even without caselaw on point." *Cantu*, 974 F.3d at 1232–33 (quoting *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000)). This case falls far short of this exacting standard. Officer Deason and Deputy Wade responded to a deadly threat with deadly force, and, by all indications, the force abated once the threat abated. No Supreme Court or Eleventh Circuit precedent suggests the obviousness exception applies here.

Even if Deputy Wade and Officer Deason violated Duncan's Fourth Amendment rights—which they didn't—they lacked fair notice that their conduct was unlawful. *See Kisela*, 138 S.Ct. at 1152. Therefore, the doctrine of qualified immunity shields them both from § 1983 liability.

## IV

Officer Deason also moved for summary judgment on Duncan's assault-and-battery claim. His motion is due to be granted for two reasons.

First, Alabama's stand-your-ground law bars Duncan's claim. Under the stand-your-ground statute, a "person may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense or the defense of another person . . . if the person reasonably believes that another person is . . . [u]sing or about to use unlawful deadly physical force." Ala. Code § 13A-3-23. For the reasons explained in Part III, Officer Deason reasonably believed Duncan was "about to use deadly physical force" on him and/or other officers. This reasonable belief immunizes him from assault-and-battery liability. *See Skinner v. Bevans*, 116 So. 3d 1147, 1152 (Ala. Civ. App. 2012) (explaining how § 13A-3-23 "establishes not only an affirmative defense, but also *immunity* from criminal prosecution *and civil action*").

Second, Alabama's peace-officer immunity defeats Duncan's claim. To earn peace-officer immunity a defendant must show that, at the time of the plaintiff's alleged injury, the defendant (1) was a peace officer, (2) performing law-enforcement duties, while (3) exercising judgment and discretion. *Ex Parte City of Montgomery*, 272 So. 3d 155 (Ala. 2018). Officer Deason satisfies all three elements. On March 4, 2018, he was a peace officer with the City of Brent Police Department. *Ex Parte City of Midfield*, 161 So. 3d 1158, 1164 (Ala. 2014). And, without question, chasing and seizing a fleeing suspect is a law-enforcement duty. Because "arresting or attempting to arrest persons" is a discretionary function of peace officers, *see Ex Parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000), the "burden shifts to [Duncan] to show that one of the two categories of exceptions to [peace-officer] immunity" applies. *Midfield*, 161 So. 3d at 1164. Duncan has not satisfied this burden. In fact, he never even responded to Officer Deason's assertion of peace-officer immunity. Summary judgment on Duncan's assault-and-battery claim is therefore due to be granted.

## V

Now to the lone remaining issue: costs and fees. Deputy Ward has asked "for the reimbursement of all fees and costs associated in the defense of this" lawsuit. His request is due to be denied.

A defendant in a § 1983 action "may recover attorney's fees from the plaintiff only if the District Court finds that the plaintiff's action was frivolous, unreasonable, or without foundation." *Hughes v. Rowe*, 499 U.S. 5, 14 (1980) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)). In *Christiansburg*, the Supreme Court cautioned courts against engaging "in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christiansburg*, 434 U.S. at 421–22. If the "plaintiff's claims are meritorious enough to receive careful attention and review," then awarding attorney's fees to the defendant is improper—even if the plaintiff's claims prove unsuccessful. *Busby v. City of Orlando*, 931 F.2d 764, 787 (11th Cir. 1991).

Duncan's § 1983 claim, while unsuccessful, survived a 12(b)(6) challenge and warranted briefing and consideration at the summary-judgment stage. Because his claim was "meritorious enough to receive careful attention and review," the Court finds that fee-shifting is not appropriate. Costs will however be taxed to the plaintiff as is customary.

## VI

The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on May 19, 2021.

_____
L. Scott Coogler
United States District Judge

203323